# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| JEREMY STEVEN MEREDITH, | Case No.: 1:13-cv-00381-EJL-REB |
| Plaintiff, | **REPORT AND RECOMMENDATION RE:** |
| vs. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** (Docket No. 35) |
| ADA COUNTY SHERIFF'S DEPARTMENT, DEPUTY SHERIFF CULBERTSON, DEPUTY SHERIFF ROE, DEPUTY SHERIFF ARNOLD, DEPUTY SHERIFF MERCADO, | **MEMORANDUM DECISION AND ORDER RE:** |
| Defendants | **PLAINTIFF'S MOTION TO TAKE JUDICIAL NOTICE** (Docket No. 41) |
| | **PLAINTIFF'S MOTION TO PRODUCE VIDEO AND MEDICAL RECORDS AND POLYGRAPH** (Docket No. 47) |

Pending before this Court are the following three motions: (1) Defendants' Motion for Summary Judgment (Docket No. 35), (2) Plaintiff's Motion to Take Judicial Notice (Docket No. 41), and (3) Plaintiff's Motion to Produce Video and Medical Records and Polygraph (Docket No. 47). Having carefully considered the record and otherwise being fully advised, the undersigned enters the following Report and Recommendation as to the first dispositive motion, and a Memorandum Decision and Order as to the latter two non-dispositive motions:

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 1**

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Plaintiff is a prisoner in the custody of the Idaho Department of Correction ("IDOC"), currently incarcerated at Idaho State Correctional Institution.  The events giving rise to Plaintiff's claims occurred while he was a pre-trial detainee in the custody of the Ada County Jail.  The crux of Plaintiff's Complaint is that Defendants tortured him and that the Ada County Sheriff's Office has failed to train its employees to deal with mentally ill inmates whose behavior problems are "merely . . . symptom[s] of [their] mental illness."  Compl., p. 2 (Docket No. 3).

Plaintiff states that, while in the Ada County Jail, he was placed on "orange status suicide watch for mental health reasons."  Pl.'s Aff., p. 1 (Docket No. 3, Att. 1).  On August 22, 2012, Plaintiff began having hallucinations that bugs were crawling all over him; in turn, Plaintiff asked Deputy Mercado if he could have a shower, but Mercado allegedly ignored him.  *See id*. at pp. 1-2.  Plaintiff then began yelling and screaming, banging the door of his cell, and calling Mercado "every name in the book."  *Id*. at p. 2.

About an hour later, Deputies Roe and Culbertson allegedly told Plaintiff that they were taking him somewhere that had a shower; instead, they took him to an empty cell.  *See id*.  Plaintiff was ordered to enter the cell, but refused and laid still.  *See id*.  Roe and Culbertson then "grabbed [Plaintiff] by [his] arms and legs" and "picked [him] up and threw [him] into the cell."  *Id*.  Plaintiff claims Roe and Culbertson gave him a long pair of chains and that the deputies slammed the cell door, saying, "you known what to do."  *Id*.  Plaintiff asked "why are you doing

---

[1]  Owing to the nature of this action and the fact that it has been pending for more than two years, multiple orders from this Court have already outlined the factual backdrop leading up to Plaintiff's claims.  The undersigned therefore borrows from these previous orders – namely the  November 15, 2015 Initial Review Order (Docket No. 5) and the September 25, 2014 Memorandum Decision and Order (Docket No. 28) – when presenting the factual background here.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 2**

this?" to which Roe and Culbertson responded, "you know why" and "have fun."   *Id*. at; *see also* Compl., pp. 3-4 (Docket No. 3).  Plaintiff then attempted to strangle himself and claims that Roe and Culbertson "watched till everything went dark."  Pl.'s Aff., p. 2 (Docket No. 3, Att. 1). Plaintiff woke up later to Culbertson breaking his already-injured hand.  *See id*.

Plaintiff was stripped and left in the cell "completely naked with no blanket."  *Id*. at p. 3. Several hours later, Roe and Culbertson gave Plaintiff a smock and took him back to his original cell.  *See id*.  Plaintiff contends the cell was extremely cold, so he asked for a blanket; but Roe and Culbertson "lied and said they were out of blankets."  *Id*.  Plaintiff states that he then "did the only thing [he] could to stay warm and climbed into the mattress by opening a hole and went to sleep."  *Id*.  Mercado then arrived and asked Plaintiff what he was doing.  *See id*.  Plaintiff explained that he was cold and that "[he will] pay for it if [he] ha[s] to and went back to trying to sleep."  *Id*.  Mercado left, returning later with Deputy Arnold and other unknown deputies.  *See id*.

Arnold then ordered Plaintiff to get out of the mattress.  *See id*.  Plaintiff replied, "just give me a blanket so I don't get sick."  *Id*.  When Arnold asked whether Plaintiff was refusing to get out of the mattress, Plaintiff said no; Arnold then allegedly sprayed Plaintiff with mace.  *See id*.  According to Plaintiff, the chemical "had not activated fully because how dry [his skin] was."  *Id*.  Arnold and another officer then moved Plaintiff to the shower, with Plaintiff claiming that the shower's water activated the chemical, prompting him to drop to his knees in pain.  *See id*.  When the deputies told Plaintiff to "cuff-up," Plaintiff apparently said, "hold on, I can't see." *Id*.  Plaintiff was then sprayed with mace a second time and "screamed as if [he] were dying and rolled on the ground for endless minutes."  *Id*.  The deputies then brought Plaintiff back to his

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 3**

cell "still covered with mace" *Id*. at p. 4.  Plaintiff "ended up urinating on the floor from the

pain [he] was experiencing" and tried to get water from the sink. *Id*.  However, Plaintiff was not

allowed to wash himself, so he stuck his "entire face in the dirty toilet." *Id*.  The cell flooded as

a result, and Defendants refused to let Plaintiff clean his cell. *See id*.  Plaintiff was eventually

released when his family posted bail, and he fled to Mexico before he was apprehended and

returned to Idaho. *See id*. at pp. 4-5.

Plaintiff filed this action on August 29, 2013, alleging a 42 U.S.C. § 1983 claim

against the Ada County Sheriff's Department, and Deputy Sheriffs Culbertson, Roe, Arnold, and

Mercado. *See* Compl. (Docket No. 3); Pl.'s Aff. (Docket No. 3, Att. 1); Not. of Claim (Docket

No. 3, Att. 2).

Within its November 15, 2013 Initial Review Order, the Court determined that Plaintiff

could not proceed against the Ada County Sheriff's Department and Deputy Mercado, finding in

relevant part:

> Plaintiff has not stated a colorable claim against Defendant Mercado because the
> only allegations against him – other than that he participated in a conspiracy – are
> that he ignored Plaintiff's request for a shower.  Plaintiff has not offered any facts
> supporting an inference that, in doing so, Mercado disregarded a substantial risk of
> serious harm to Plaintiff.  And because Plaintiff has not indicated how long he was
> forced to go without cleaning supplies after the toilet flooded his cell, his claim that
> the condition of his cell constituted punishment in violation of the Fourteenth
> Amendment is not supported by specific facts.
>
> . . . .
>
> The Ada County Sheriff's Office is not an appropriate defendant in this case.  The
> Sheriff's Office is a subdivision of Ada County and is not a separate legal entity that
> can be sued under § 1983.  Under some circumstances, a local governmental entity,
> such as Ada County, can be a proper defendant in a § 1983 lawsuit.  But local
> governments are not liable simply because they employ the person who the plaintiff
> claims violated his or her constitutional rights.  To state a claim against a local
> governmental entity, the plaintiff must instead allege that the entity had a policy,

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 4**

> custom, or practice that was the moving force behind the constitutional inquiry. . . . Here, Plaintiff has not alleged facts from which a factfinder could reasonably conclude that staff at the Ada County Jail were following an Ada County policy, custom, or practice when they allegedly broke Plaintiff's hand, sprayed him with mace, or watched him try to harm himself.  Plaintiff may not proceed on a failure-to-train theory because he does not allege facts suggesting that Ada County officials knew of the need to provide more training to correctional officers with respect to the behavioral problems of mentally unstable inmates.

Initial Review Order, pp. 9-11, 13 (Docket No. 5) (internal citations omitted).  Even so, the Initial Review Order allowed Plaintiff to proceed against Deputies Roe, Culbertson, and Arnold on certain limited causes of action – specifically, Plaintiff was permitted to proceed on the following claims: (1) "Fourteenth Amendment claims that Roe and Culbertson were deliberately indifferent to Plaintiff's risk of self-harm"; (2) "Fourth and Fourteenth Amendment claims that Culbertson broke Plaintiff's hand"; and (3) "Fourth and Fourteenth Amendment claims that Arnold sprayed Plaintiff twice with mace."   *See id*. at p. 13.

On January 15, 2014, the remaining Defendants (Deputies Roe, Culbertson, and Arnold) filed a motion to dismiss pursuant to FRCP 12(b) on the grounds that (1) Plaintiff failed to state a claim for which relief can be granted; (2) Plaintiff failed to exhaust his administrative remedies; and (3) qualified immunity shields Roe, Culbertson, and Arnold.  *See generally* Mem. in Supp. of MTD (Docket No. 15, Att. 1).

On September 25, 2014, this Court granted, in part, and denied, in part, Defendants' motion to dismiss, finding in relevant part:

> Initially, the Court recognizes that in the grievance filed by Plaintiff, whether it was exhausted or not, there is no mention of his broken hand.  Instead, he grieved the issues of being left alone to strangle himself and being maced.  Even if Plaintiff is excused from exhausting his other claims, there is no question that he did not attempt to grieve his broken hand.  Without this issued being grieved, the jail had no "opportunity to resolve disputes" before being haled into court, a primary purpose behind the [Prison Litigation Reform Act's] exhaustion requirement.  The Court

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 5**

finds that Plaintiff failed to exhaust any claims related to his broken hand and that claim is dismissed without prejudice.[2]

. . . .

Plaintiff's allegations are sufficient to state a claim for failure to protect.  Plaintiff alleges that Defendants Roe and Culbertson stood by and watched him while he attempted to strangle himself with chains.  Defendants may well be correct that Plaintiff's allegations that Defendants told him to "have fun" and "you know what to do" are not sufficient, in and of themselves, to state a deliberate indifference claim.  However, assuming the truth of all of his allegations, including that these Defendants stood by and did nothing while he strangled himself, Plaintiff has stated a plausible claim for relief.

The Defendants also argue they are entitled to qualified immunity.  The court concludes that it cannot be determined based on the face of the complaint itself whether qualified immunity applies.  Courts have recognized that the qualified immunity defense is generally not amendable to dismissal under Rule 12(b)(6) because facts necessary to establish this affirmative defense generally must be shown by matter outside the complaint.  Whether Plaintiff's constitutional rights were violated and whether a reasonable official would have known their conduct was violating a clearly established right hinges on further factual development.[3]

. . . .

Plaintiff has stated a claim for excessive force under the Fourth Amendment.  Plaintiff alleges that Defendant Arnold sprayed him twice with mace.  The first time,

---

[2]  However, as to Plaintiff's *other* claims in which Defendants argued that he also failed to exhaust his administrative remedies, the Court went on to find:

> Where there are differing versions of material facts on the exhaustion defense, summary judgment on the issue is not appropriate.  The Court finds there is a genuine issue of material fact regarding whether administrative remedies were "effectively unavailable" to Plaintiff because his efforts to grieve, or exhaust, the August 22, 2010 incident in question were "thwarted," thereby excusing the exhaustion requirement.  Defendants' motion is granted in part, as to the claim involving Plaintiff's broken hand, and denied in part, without prejudice, as to the remaining claims.

9/25/14 MDO, p. 15 (Docket No. 28).

[3]  The Court additionally stated that "[d]iscovery has yet to take place and Defendants have not filed any affidavits regarding the merits of Plaintiff's claims" before concluding that Defendants' qualified immunity arguments "would be better addressed on summary judgment when there are sufficient facts before the Court."  9/25/14 MDO, pp. 22-23 (Docket No. 28).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 6**

Plaintiff claims he was trying to stay warm inside his mattress and informed Arnold he would get out if he could have a blanket, yet Arnold proceeded to spray him with mace.  The second time, a short while later, after a shower seemingly to wash off the mace, Plaintiff was told to cuff up to which he responded "hold on" and he was again sprayed with mace by Arnold.  Assuming the truth of Plaintiff's allegations, the Court finds he has stated a plausible claim of excessive force.

With regard to Defendant Arnold's argument that the claim against him should be dismissed on the basis of qualified immunity, the Court again finds that the determination of whether qualified immunity applies is too fact-intensive to be resolved at this stage of the proceedings, when no discovery has taken place.[4]

9/25/14 MDO, 13-15, 22-24 (Docket No. 28) (internal citations omitted).  All told, then, after the Court's consideration of Defendants' motion to dismiss, the following claims remained:  (1) Plaintiff's deliberate indifference claims against Deputies Roe and Culbertson, and (2) Plaintiff's excessive force claim against Deputy Arnold.  *See id*. at p. 25 (granting motion to dismiss *only* as to Plaintiff's Fourteenth Amendment claim against Deputy Culbertson for his broken hand due to Plaintiff's failure to exhaust administrative remedies).

After Defendants answered Plaintiff's Complaint, the Court issued a Scheduling Order on November 12, 2014, governing the pretrial schedule of this case.  *See* Ans. (Docket No. 29); Sched. Order (Docket No. 31).  Among other things, the Scheduling Order required the parties to (1) provide each other "with relevant information and documents pertaining to the claims and defenses in this case, including the names of individuals likely to have discoverable information, along with the subject of the information, as well as any relevant documents in their possession" (within 30 days); (2) amend pleadings or join parties within 90 days; (3) complete all discovery within 180 days after entry of the Scheduling Order; and (4) file motions for summary judgment and other potentially-dispositive motions within 30 days after the close of discovery.  *See* Sched.

---

⁴  Again, the Court noted that Defendants' related qualified immunity arguments "would be better addressed on summary judgment."  9/25/14 MDO, p. 24 (Docket No. 28).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 7**

Order, pp. 1-5 (Docket No. 31).  Relevant to these deadlines, Defendants claim that they provided Plaintiff with 737 pages of jail and medical documents on December 11, 2014, while also pointing out that Plaintiff never amended his pleadings or joined any parties.  *See* Mem. in Supp. of MSJ, p. 2 (Docket No. 35, Att. 1) (citing Ex. A to Jorgensen Aff. (Docket No. 36)).

Defendants (Deputies Culbertson, Roe, and Arnold) now move for summary judgment pursuant to FRCP 56 "on the grounds that [Plaintiff] has failed to state a claim against Deputy Arnold and that qualified immunity shields Deputies Culbertson, Roe, and Arnold from suit in this matter."  *Id*. at p. 2.[5]

## II. <u>STANDARDS</u>

### A.  **Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."

---

[5]  The thrust of this Report and Recommendation/Memorandum Decision and Order is unquestionably Defendants' Motion for Summary Judgment.  Even so, Plaintiff's other two motions – Plaintiff's Motion to Take Judicial Notice (Docket No. 41) and Motion to Produce Video and Medical Records and Polygraph (Docket No. 47) – will be addressed herein.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 8**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute

as to any *material* fact – a fact "that may affect the outcome of the case."  *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and

the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the non-movant

must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir.

1999).  On the other hand, the Court is not required to adopt unreasonable inferences from

circumstantial evidence.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine

dispute as to a material fact.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en

banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such

as affidavits or deposition excerpts) but may simply point out the absence of evidence to support

the nonmoving party's case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th

Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a

jury verdict in his favor.  *See Devereaux*, 263 F.3d at 1076.  The non-moving party must go

beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to

interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex*, 477

U.S. at 324.

**B.**     **Qualified Immunity**

Even if a plaintiff is able to show a violation of a constitutional right under § 1983, a

defendant may still be entitled to summary judgment on the basis of qualified immunity.  The

doctrine of qualified immunity protects state officials from personal liability for on-the-job

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 9**

conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly-established federal rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Conversely, a state official may be held personally liable in a § 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights. *See id.* True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quotation omitted).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right"; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *C.B. v. City of Sonora*, 730 F.3d 816, 825 (9th Cir. 2013).[6] Qualified immunity operates to ensure that a government official is on notice that his conduct is unlawful, before he is subject to suit. *Pearson*, 555 U.S. at 244 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

To determine whether the right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act. *See Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent, the district courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *See id.*

_____

[6] Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 10**

The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not necessary that the "very action in question has previously been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent" to the official. *Id*. "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments.'" *City and Cnty. of San Francisco, Calif. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 1765, 2085 (2011)).

Application of qualified immunity is appropriate where "the law did not put the [defendant] on notice that his conduct would be clearly unlawful." *Id*. However, if there is a genuine dispute as to the "facts and circumstances within an officer's knowledge," or "what the officer and claimant did or failed to do," summary judgment is inappropriate. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). When a § 1983 defendant makes a properly supported motion for summary judgment based on qualified immunity, the plaintiff has the obligation to produce evidence of his own; the district court cannot simply assume the truth of the challenged factual allegations in the complaint. *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004)). That being said, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. *See Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 11**

## III.  REPORT/DISCUSSION

**A.      Defendants' Motion for Summary Judgment (Docket No. 35)**

Defendants' Motion for Summary Judgment essentially presents three separate (but interrelated) arguments: first, that Plaintiff cannot state an excessive force claim against Deputy Arnold because Arnold only sprayed Plaintiff with mace once (not twice); second, that Arnold is entitled to qualified immunity regardless of Plaintiff's above-stated inability to assert a claim against him; and third, that Deputies Roe and Culbertson, like Arnold, are entitled to qualified immunity as to Plaintiff's failure to protect/deliberate indifference claim.  *See generally* Mem. in Supp. of MSJ (Docket No. 35, Att. 1).  Each argument is addressed below.

### 1.      Deputy Arnold and Plaintiff's Excessive Force Claim

The Court's September 25, 2014 Memorandum Decision and Order outlines the state of the law regarding excessive force claims:

> Claims of excessive force for an individual who is a pretrial detainee are analyzed under the Fourth Amendment's "reasonableness" standard, which requires "balancing the nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake."  *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053-54 (9th Cir. 2007).  First, the "quantum of force" must be assessed. Second, the governmental interests at stake must be analyzed in light of the following factors: (1) the severity of the crime for which the plaintiff was arrested; (2) whether the plaintiff posed a threat to the safety of the officers or others; (3) whether the plaintiff was actively resisting arrest or attempting to flee; and (4) the availability of alternative methods of subduing the plaintiff.  *Id.*

9/25/14 MDO, p. 23 (Docket No. 28).  With this legal framework in mind, the Court previously determined that Plaintiff's allegation that Deputy Arnold sprayed him twice with mace sufficiently stated a claim for excessive force under the Fourth Amendment, denying Defendants' motion to dismiss on this point.  *See supra* (quoting 9/25/14 MDO, pp. 23-24

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 12**

(Docket No. 28) ("The first time, Plaintiff claims he was trying to stay warm inside his mattress and informed Arnold he would get out if he could have a blanket, yet Arnold proceeded to spray him with mace.  The second time, a short while later, after a shower seemingly to wash off the mace, Plaintiff was told to cuff up to which he responded "hold on" and he was again sprayed with mace by Arnold.  Assuming the truth of Plaintiff's allegations, the Court finds he has stated a plausible claim of excessive force.") (internal citation omitted)).

Now, through the at-issue Motion for Summary Judgment, Defendants argue that Plaintiff's excessive force claim against Deputy Arnold should be dismissed because Arnold never sprayed Plaintiff with mace a second time in the shower.  *See* Mem. in Supp. of MSJ, p. 17 (Docket No. 35, Att. 1) ("Because Deputy Arnold did not spray [Plaintiff] in the shower, the excessive force claim as to the spraying in the shower must be dismissed because Deputy Arnold did not personally participate in the alleged violation.").

It is true that, based upon the record now before the Court, Deputy Arnold sprayed Plaintiff with mace only one time (when Plaintiff climbed inside his mattress); he did not spray Plaintiff with mace a second time in the shower as Plaintiff contends.  Defendants' Answer to Plaintiff's Complaint states this position in no uncertain terms.  *See* Answer, p. 7 (Docket No. 29) ("Defendants deny that Deputy Sheriff Arnold sprayed [Plaintiff] with Oleoresin Capsicum while [Plaintiff] was in the shower.").  Moreover, the "Incident Notes" for the incident in question describes as much, with Deputy Roe stating:

> On 8-22-12 I was assigned as Sergeant Ivie's Team Lead in the Ada County Jail.
>
> After Inmate Meredith was done washing the Oleoresin Capsicum (OC) off himself in the shower, we asked him to turn around and place his hands out so he could be handcuffed.  He refused saying, "I want to see a Nurse first."

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 13**

Inmate Meredith was informed by several deputies that he would need to comply with the orders given to him.  Meredith still refused to be handcuffed, saying, "I am going to sue you," "you are all pussies," and "I told you I would get my shower."

I approached the shower cell and asked Inmate Meredith three times "to turn around and place his hands out through the wikie port."  Meredith still did not comply, I gave him a final order to turn around and put his hands out to be handcuffed.  He did not turn around, made no movement, and gave no indication that he was going to follow my order.

*Deputy Culbertson opened the shower cell door, while I deployed my OC giving an approximate three second burst to Inmate Meredith.*

Inmate Meredith was allowed to shower again so as to decontaminate himself.  Once he was done, he complied with our orders for handcuffing and was moved back into his cell (917) without incident.

He was given a safety gown and a styrofoam cup.

Inmate Meredith was cleared medically by Nurse Walker.

Ex. A to Jorgensen Aff. at Bates 288 (Docket No. 36) (emphasis added).  But the mere fact that Deputy Arnold only sprayed Plaintiff with mace a single time does not ipso facto render Plaintiff's excessive force claim without merit.

The Court's earlier denial of Defendants' motion to dismiss Plaintiff's excessive force claim against Deputy Arnold did not necessarily turn upon the number of times Arnold sprayed Plaintiff with mace.  That there were two such instances alleged naturally went into the Court's discussion on the matter; however, it cannot be said (as Defendants appear to now be doing via their Motion for Summary Judgment) that, *but for the second instance*, the claim cannot stand.  Said another way, there is nothing in the record or the briefing to date that compels a finding as a matter of law that no excessive force claim can possibly attach to Deputy Arnold spraying Plaintiff with mace in relation to Plaintiff climbing inside his mattress.  *But see* Mem. in Supp. of

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 14**

MSJ, pp. 9-14 (Docket No. 35, Att. 1).[7]  This is not to say that Plaintiff's excessive force claim is meritorious, but only that the record cannot support a finding at this juncture that such a claim must legally fail.

Accordingly, Defendants' Motion for Summary Judgment should be denied in this limited respect.  *But see infra*.

2.      Deputy Arnold and Qualified Immunity

Qualified immunity operates to protect officers from the sometimes "hazy border between excessive and acceptable force," and to ensure that before they are subject to suit, officers are on notice that their conduct is unlawful.  *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (quoting *Saucier*, 533 U.S. at 206); *see also supra*.  "If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."  *Id*. at 198.

As support for their Motion for Summary Judgment, Defendants argue that Deputy Arnold's conduct did not violate Plaintiff's constitutional right (the first prong of the qualified immunity analysis) "because the amount of pepper spray used was not greater than necessary and was not used for the purpose of inflicting pain."  Mem. in Supp. of MSJ, pp. 9-14 (Docket No. 35, Att. 1).  Though this may very well be the case, the Court chooses to begin its inquiry by addressing the more easily ascertained second prong of the qualified immunity analysis –

_____

[7]  The undersigned acknowledges Defendants' efforts to show, within the qualified immunity context, that Deputy Arnold's conduct in pepper spraying Plaintiff in this isolated instance did not constitute excessive force.  *See* Mem. in Supp. of MSJ, pp. 9-14 (Docket No. 35, Att. 1).  Defendants' arguments vis à vis this defense are addressed later in this Report and Recommendation/Memorandum Decision and Order.  *See infra*.  Still, to the extent Defendants argue that Plaintiff's excessive force claim against Deputy Arnold must fail when premised solely upon the second pepper spraying incident, that argument is well-taken as to any excessive force claim against Deputy Arnold.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 15**

whether any such constitutional violation (even if assumed) was clearly established.  *See al-Kidd*, 131 S.Ct. at 2080 ("Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'") (internal citation omitted).  The inquiry as to whether the right was clearly established is "solely a question of law for the judge."  *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (quoting *Tortu v. Las Vegas Metro. Police Dept.*, 556 F.3d 1075, 1085 (9th Cir. 2009)).

The accounts of the incident prompting Plaintiff's excessive force claim do not materially differ between Plaintiff and Deputy Arnold.  Plaintiff alleges:

> I asked for a blanket to cover myself.  They lied and said they were out of blankets.  After a while I did the only think I could to stay warm and climbed into the mattress by opening a hole and went to sleep.  Mercado came by and asked me why I was inside my mattress?  I told him "because I'm cold" and I'll pay for it if I have to and went back to trying to sleep.  He said he would be back with more people.  I said just give me a blanket so I don't get sick.  He didn't answer me.  *Deputy Arnold and some other unknown officers showed.  Arnold told me to get out.  I said I would "just give me a blanket so I don't get sick."  He asked me if I was refusing.  I said "no" then he sprayed me with chemicals.  It hadn't activated fully because of how dry I was so I climbed out and they moved me over to the shower* . . . .

Pl.'s Aff., p. 3 (Docket No. 3, Att. 1) (emphasis added).  In comparison, within the related "Incident Notes," Arnold says:

> On August 23, 2012, I was assigned to work booking team 10 nights.  At 0300 am, I was called over the radio by Sergeant Forrey, to report to HSU North.

> When I arrived in HSU North, Sergeants Forrey and Ivie, along with deputies C. Roe, J. Scott, R. Culbertson, S. Turley were all in the office.  I was then briefed on inmate Meredith's actions.  Meredith was on yellow suicide precautions and had torn a mattress and climbed into the hole obstructing a view of his person.  See report 201205509 for details.  See also the report by Deputy Culbertson #201205509.[8]

---

[8]   The referenced reports are attached to the affidavits of Deputies Culbertson and Roe and are addressed elsewhere in this Report and Recommendation/Memorandum Decision and Order as to Culbertson's and Roe's summary judgment arguments.  *See* Ex. B to Culbertson Aff. (Docket No. 35, Att. 4); Ex. C to Roe Aff. (Docket No. 35, Att. 5).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 16**

Sergeant Forrey instructed me that I would give him one last opportunity to comply with orders to give us the mattress and I was also instructed to OC (Oleoresin Capsicum) him if he did not comply with instructions.

As I spoke to Meredith through the food port, I asked him to comply and give us the mattress.  He said that he would give it to us if we gave him a blanket.  I instructed him that I did not have a blanket to give to him, due to the blanket's being washed. I instructed him that if he did not give us the mattress, force would have to be used. He stated that we would have to come and beat him up for the mattress.  I then deployed OC through the food slot, hitting him in the face and in the back of his head.  I then shut the food slot door, to allow the OC to take effect.   After approximately 5 minutes, Deputy's Roe, Culbertson, Turley, and myself entered the cell and asked if he was ready to give us the mattress.  He stated that he was ready. We exited the cell and he was handcuffed through the food port to be escorted to the shower, where he showered to decontaminate.

Additional information:  Meredith continued to be disrespectful toward staff by calling us "a bunch of pussies."  He also stated that he "hoped he would not see any of us on the outs," implying he would seek revenge for the actions wee took.

Ex. B to Arnold Aff. (Docket No. 35, Att. 3).  Arnold's subsequently-filed affidavit provides the

following additional details:

Because of Mr. Meredith's classification as a Level Two security risk, I ensured officer safety by attempting to spray Mr. Meredith through the utility port.  It was approximately eight (8) feet from the utility port to where Meredith was located.  I attempted to deploy the spray in a three second burst but the can either malfunctioned or because of the distance of 8 feet, the spray may have been depleted.

It appeared that I may have gotten some spray on Mr. Meredith's face and head.  I did not want to be excessive so I did not spray more.  I decided to close the utility port and wait five (5) minutes to see if Mr. Meredith was impacted by the spray.

It appeared that Mr. Meredith experienced secondary impacts from the spray because he was coughing and appeared uncomfortable.  We entered the cell and I offered to take him to the shower if he would give me the mattress.  He agreed to give me the mattress.

Mr. Meredith was walked to the shower to wash any residual OC spray off.

Arnold Aff., ¶¶ 15-18 (Docket No. 35, Att. 3).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 17**

Additionally, the surrounding circumstances preceding (and illuminating) the above-described incident between Plaintiff and Deputy Arnold are not in question here, including the following relevant facts:

- Plaintiff was housed in the Health Services Unit ("HSU") of the Ada County Jail, with a "Level Two" security status, meaning he was a high security risk to staff and inmates. *See* Arnold Aff., ¶ 13 (Docket No. 35, Att. 3); Roe Aff., ¶ 7 (Docket No. 35, Att. 5); Culbertson Aff., ¶ 8 (Docket No. 35, Att. 4).

- Given Plaintiff's security status, he could not be in open areas without restraints, and deputy sheriffs cannot be in a cell with him unless he was restrained. *See* Culbertson Aff., ¶ 7 (Docket No. 35, Att. 4); Arnold Aff., ¶ 10 (Docket No. 35, Att. 3); Roe Aff., ¶ 7 (Docket No. 35, Att. 5).

- On the evening of August 22, 2012, Plaintiff acknowledges he yelled, screamed, banged on the cell door in the HSU and called Deputy Mercado "every name in the book" for over an hour. Pl.'s Aff., p. 2 (Docket No. 3, Att. 1).

- Upon tearing through the cover of his mattress and situating himself between the mattress's foam and plastic parts, no part of Plaintiff was visible; therefore, the officers assigned to conduct wellness checks on Plaintiff (whose suicide precaution level had been elevated from orange to yellow) said that the mattress was obstructing their view of Plaintiff. *See* Arnold Aff., ¶ 13 (Docket No. 35, Att. 3); Culbertson Aff., ¶ 20 (Docket No. 35, Att. 4); Roe Aff., ¶¶ 20, 21 (Docket No. 35, Att. 5) ("Meredith refused to get out of the mattress so the Special Response Team was called. This was not just due to the property damage, but because Meredith could have harmed himself with the torn mattress fabric that was accumulating in the cell.").

In this understood setting, Plaintiff points to no case where the use of pepper spray under the circumstances faced here – where a detainee (with prior obstreperous behavior, a heightened security risk, and on suicide watch) was at risk of hurting himself and potentially others by tearing into the fabric of his mattress and concealing himself inside despite warnings and orders – had been found to constitute excessive force.  Therefore, *even if* such conduct was found to actually represent excessive force (the undersigned makes no such finding here), it would not

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 18**

have been clear to a reasonable officer at the time he/she so sprayed Plaintiff with pepper spray

that such conduct was unlawful.  Without such "fair notice," an officer like Deputy Arnold

should be entitled to qualified immunity.  *See Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014).

The Court's own examination of germane case law is consistent with such a finding.

Although few Ninth Circuit cases deal with constitutional limits on the use of pepper spray, it is

clear that "[t]o determine that the law was clearly established, we need not look to a case with

identical or even materially similar facts."  *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir.

2003) (internal quotation marks and citations omitted).  To begin, the right to be free from the

application of non-trivial force for engaging in mere passive resistance was clearly established

prior to August 22, 2012 – the date of the incident considered in this action.  *See Nelson v. City

of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (cases dating back to 2001 have established that "[a]

failure to fully or immediately comply with an officer's orders neither rises to the level of active

resistance nor justifies the application of a non-trivial amount of force."); *see also Deorle v.

Rutherford*, 272 F.3d 1272, 1282-85 (9th Cir. 2013) (shooting beanbag projectile at suicidal,

irrational individual who was walking towards officer was excessive, given crime committed

was minor, danger to officer and others was minimal, no immediate need to subdue him, and he

was not given warning; also, no qualified immunity, concluding that every police officer should

have known it was objectively unreasonable to use such force under those circumstances);

*Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (Eighth Amendment violation found

where officer discharged can of pepper spray until empty, and other officer also joined in);

*Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1131 (9th Cir. 2002) (considering

use of pepper spray to subdue, remove, or arrest nonviolent protesters, concluding that "[t]he law

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 19**

regarding a police officer's use of force against a passive individual was sufficiently clear" in 1997 to put officers on notice that such force was excessive);

At the same time, the use of pepper spray in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required.  *See Furnace*, 705 F.3d at 1028 (quoting *Spain v. Procunier*, 600 F.2d 189, 195 (9th Cir. 1979)); *see also Clement v. Gomez*, 298 F.3d 898, 901-02 (9th Cir. 2002) (no constitutional violation when officers applied two bursts of pepper spray into cell, each lasting five seconds, when one prisoner had another prisoner in a headlock, was punching him in the face and slamming his head against the wall, and threatening to kill him); *Eccleston v. Oregon ex rel. Oregon Dept. of Corr.*, 168 Fed. Appx. 760 (9th Cir. 2006) (finding that use of chemical agent to extract prisoner from cell did not constitute cruel and unusual punishment where evidence demonstrated that prisoner repeatedly did not follow orders to leave his cell); *Banks v. McDonald*, 81 Fed. Appx. 227 (9th Cir. 2003) (summary judgment on prisoner's excessive force claim was proper where prisoner was warned that refusing lawful orders to cuff up would result in being sprayed, prisoner was sprayed six or seven times, and correctional officer stopped spraying once prisoner complied); *Giles v. Soto*, 2011 WL 4433109, *3 (E.D. Cal. 2011) (correctional officers entitled to qualified immunity for pepper spraying inmate who refused to comply with order); *Howard v. Nunley*, 2010 WL 3785536, *5-6 (E.D. Cal. 2010) (not clearly established that using pepper spray on disobedient prisoner would violate constitutional right).

Deputy Arnold sprayed Plaintiff with pepper spray once and then only after Plaintiff refused to comply with orders to remove himself from the mattress that he tore apart and into

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 20**

which he had placed himself.  In no way does Plaintiff's behavior represent the sort of  passive or nonviolent conduct that would render Arnold's corresponding actions in deploying non-trivial force objectively unreasonable and, therefore, a clearly established constitutional violation.  To the contrary, Plaintiff engaged in behavior that could be perceived as threatening and resisting; Arnold used the pepper spray to obtain Plaintiff's compliance within a jail setting, after it appeared that Plaintiff may have (or still could) hurt himself; and Plaintiff was permitted to wash himself and see a nurse after being sprayed with pepper spray.  There is simply no evidence that Arnold used more pepper spray than was necessary to obtain Plaintiff's compliance or that he used the pepper spray to cause unnecessary and wanton pain and suffering to Plaintiff – at least not to the point where such conduct represented a clearly established constitutional violation.  *See, e.g.*, *Jones v. Lebeck*, 2014 WL 2624975, *2 (E.D. Cal. 2014) ("Force does not amount to a constitutional violation, however, if it is applied in a good faith effort to restore discipline and order, and not 'maliciously and sadistically for the purpose of causing harm.'" (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)).  Accordingly, *even assuming* a constitutional violation, qualified immunity applies.  Accordingly, Defendants' Motion for Summary Judgment should be granted in this limited respect.

        3.     <u>Deputies Roe and Culbertson, Plaintiff's Failure to Protect/Deliberate Indifference Claim, and Qualified Immunity</u>

        The Court's September 25, 2014 Memorandum Decision and Order outlines the state of the law regarding failure to protect claims:

> To state a claim of failure to protect, an inmate must allege that he is incarcerated under conditions posing a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  When a prison official is deliberately indifferent to a substantial risk of serious harm, his conduct violates the Eighth Amendment. *Id*. at 828. "Deliberate indifference" requires a showing that the official was "subjectively aware of the risk." *Id*. at 829. The Ninth Circuit uses the deliberate indifference standard of the Eighth Amendment to determine whether a pretrial detainee's

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 21**

Fourteenth Amendment right not to be punished has been violated. *Redman v. county of San Diego*, 942 F.2d 1435, 1440-41 (9th Cir. 1991).

9/25/14 MDO, pp. 21-22 (Docket No. 28). The Court has ruled that Plaintiff sufficiently stated a claim for failure to protect when considering Defendants' motion to dismiss. *See id*. at p. 22. Now, Deputies Roe and Culbertson move for summary judgment, arguing that they have qualified immunity against such a claim – an issue the Court previously reserved for consideration on summary judgment. *See* Mem. in Supp. of MSJ, p. 4 (Docket No. 35, Att. 1) ("Deputies Roe and Culbertson are entitled to qualified immunity because they did not violate Mr. Meredith's constitutional rights nor was the right at issue clearly established.").

Plaintiff's failure to protect claim turns on the events leading up to his alleged suicide attempt. Not surprisingly, the involved parties' accounts differ in this regard. On the one hand, Plaintiff alleges:

> [Deputy Culbertson] conspired to lead and assist in a suicide by leading the Plaintiff who was awaiting trial into believing he was going to be finally receiving a shower after screening and begging for over an hour. Then altering course to the old medical shut down unit with Roe assisting you in throwing me into an empty cold cell, giving me a long set of chains, slamming the door where I waited a moment, then began to strangle myself as you stood by and watched [until] I passed out.
>
> . . . .
>
> [Deputy Roe] aided and abetted Culbertson in tricking me in believing I was going to be receiving a shower, then altering course from shower to old closed down medical unit. When I realized where you were taking me I resisted. You drew your taser, then ordered me into the cold empty cell. I laid there motionless and you and Culbertson picked me up and threw me in the cell with a set of long chains. I asked why are you doing this. You told me I knew why. You slammed the door and said "have fun." I sat there for a moment then did what they intended for me to do on suicide watch and began strangling myself while you and Culbertson watched.
>
> . . . .
>
> Roe and Culbertson grabbed me by my arms and legs, picked me up and threw me into the cell. I asked why are you doing this, they said "you know why" and left me with a long pair of chains. They then slammed the door and said "you know what to do." I waited there for a moment then began to strangle myself. This was in the

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 22**

old closed down medical unit, no surveillance that I know.  I strangled myself while Culbertson watched till everything went dark. . . . .

Compl., pp. 3-4 (Docket No. 3); Pl.'s Aff., p. 2 (Docket No. 3, Att. 1).[9]

In contrast, both Deputy Roe's and Deputy Culbertson's accounts are quite different.  For example, Roe contends:

> Inmate Meredith cooperated with the restraint process and had no issues until we were about to leave HSU North and enter the main hallway.  He asked if he would be getting a shower and I told him, "No."  He then began to state that I had lied to him and said, "This is bullshit."  He also attempted to stand up out of the wheel chair.  Deputy Culbertson and I sat him back down by placing pressure on his shoulders.  Once out in the hallway, Inmate Meredith began to drag his feet on the floor in what I believed to be an attempt to hinder our moving of him.
>
> We reached cell block 30 without incident (though he did argue the entire transport about getting a shower and how the deputies are all going to hell) and informed Inmate Meredith that he would be staying here (point to the cell) on 15 minute watches.  We let him know he would return to his normal cell once he cooperated with our instructions and orders.
>
> While assisting Meredith to a standing position out of the wheel chair, he began to shrug away from Deputy Culbertson and myself which resulted in our lowering him down to the ground.  He kicked away from me as I attempted to secure his legs while also moving erratically on the ground making it difficult for Deputy Culbertson to secure his upper body.
>
> I removed my TASER from its holster, placed it on Inmate Meredith's upper body and informed him there was a TASER on him and to comply with our orders.  He stopped resisting.  I holstered the TASER and ordered Meredith to stand up and go

---

[9]  Plaintiff's response to Defendants' Motion for Summary Judgment is more rhetoric than retort.  *See generally* Resp. to MSJ (Docket No. 40).  Regardless, it is clear that the bases for Plaintiff's failure to protect claim extend beyond his underlying complaint and corresponding affidavit.  *See id.* at pp. 2, 5 ("I find it extremely sad that three officers can brutally torture an innocent man to the point that he pisses and vomits on himself, to the point that he has nightmares every night, to the point that the grievances he writes about what happened can barely be read, to when he can't breath when he reads the lies they say.  I am saddened that when an officer kills or tortures an innocent man that nothing is done and they go free only to continue to hurt people they are sworn to protect. . . . .  You guys are supposed to protect us but instead you torture and kill us.").

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 23**

into the cell.  He would not comply, so Sergeant Ivie, Deputy Culbertson and I carried Inmate Meredith into the temporary cell.

The rest of the incident can be found in Deputy Culbertson's supplemental report.

Ex. C to Roe Aff. (Docket No. 35, Att. 5).  Though not a part of the above-referenced "Incident Note," Deputy Roe has since commented that "[d]uring one of the [subsequent] fifteen minute checks, Deputy Sheriff Culbertson saw that Mr. Meredith had removed the leg restraint from the cast on his hand and had laid the chains around his neck"[10] and that Deputy Culbertson then "called for a 'Code 2' response," which "is a request for assistance with heightened urgency, which essentially means 'get here as soon as you can.'"  Roe Aff., ¶¶ 18-19 (Docket No. 35, Att. 5).  After responding to the call, Roe recalled that Plaintiff "was holding the restraints loosely around his neck" and that, upon removing the restraints, Plaintiff "was breathing and there were no visible signs of injury."  Id. at ¶ 19.

Deputy Culbertson's account corroborates the account of Deputy Roe and is similarly uneventful.  In relevant part, he reports:

> NARRATIVE:
> On 08/22/2012 I was assigned to Sergeant Forrey's team 10 Nights.  While conducting a well being check in cell 3A of Cell Block 30 at 2255 hours, I noticed Meredith had wrapped the leg restraints around his neck.  Meredith was not applying any force to his neck.  He was breathing and conscious.  I called for a code 2 response due to his level status.  Deputies Roe and Scott responded.  We entered the cell and removed the restraints from around his neck.  Meredith was breathing with no visible signs of trauma to his neck.

---

[10]  During this time, Plaintiff had a cast on his hand so conventional handcuffs would not fit over his cast; therefore, Deputies Roe and Culbertson put a leg restraint over Plaintiff's cast to restrain his hands for transport.  See Roe Aff., ¶ 12 (Docket No. 35, Att. 5).  According to Roe and Culbertson, Plaintiff's leg restraints were removed from his legs once he was transported to his cell; however, because Plaintiff refused to put his hands through the utility port so the leg restraints could be removed from his hands, they were left in place.  See id. at ¶ 17; see also Culbertson Aff., ¶ 13 (Docket No. 35, Att. 4).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 24**

> Nurse Walker responded and evaluated Meredith.  He was cleared of any injuries.
> Due to Meredith's behavior we have upgraded his Suicide Precaution level from
> orange status to yellow status.  Meredith's clothes were removed.  Per policy I
> conducted a strip search and all his items were removed for his safety.  Due to his
> behavior previously in HSU North and his current behavior, he was issued a safety
> smock.  Meredith was informed he would receive his safety blanket and a mattress
> after he demonstrated he would no longer try to hurt himself.

Ex. B to Culbertson Aff. (Docket No. 35, Att. 4).

Crystallized to its essence, Plaintiff contends that Deputies Roe and Culbertson facilitated

his attempted suicide, and stood by and watched as he did so.  Roe and Culbertson disagree.

Further, it is entirely appropriate for them to question whether Plaintiff actually attempted to

strangle himself.  *See* Mem. in Supp. of MSJ, pp. 16-18 (Docket No. 35, Att. 1) (arguing that

"[t]here is no evidence that the Deputies witnessed suicidal actions or heard suicidal statements

from Mr. Meredith" and that "[o]ther evidence indicates that it is questionable whether Mr.

Meredith did in fact attempt to strangle himself.").  If Roe's and Culbertson's versions of the

facts are true, there would exist no deliberate indifference to a substantial risk of serious harm

and Plaintiff's failure to protect claim would fail.  But there are genuine issues of material fact

that preclude summary judgment in these Defendants' favor.

Plaintiff argues that Roe and Culbertson knew that he would attempt to harm himself

with the leg restraints when they told him to "have fun" and "you know what to do," before

standing by and doing nothing while he strangled himself.  *See supra*.  In the summary judgment

context, the Court must look at the version of the events most favorable to Plaintiff as the

nonmoving party.  *See Anderson*, 477 U.S. at 255.  Construing the facts in Plaintiff's favor, a

trier of fact could find that Deputies Roe and Culbertson had subjective knowledge of a strong

risk that Plaintiff would attempt to commit suicide, yet deliberately did not take any action to

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 25**

prevent the same.  Such facts, if true, would be a constitutional violation.  Relatedly, because

genuine issues of material fact exist as to Plaintiff's failure to protect claim, those same genuine

issues of material fact preclude this Court from granting summary judgment on the basis of

qualified immunity.  Defendants' Motion for Summary Judgment should therefore be denied in

this limited respect.  Plaintiff is reminded, however, that establishing a genuine issue of material

fact is not a guarantee of success at trial.  In this setting, this recommendation simply means that

his claim will not be dismissed at this stage – Plaintiff still will have the burden of proving his

failure to protect claim at trial.

**B.      Plaintiff's Motion to Take Judicial Notice (Docket No. 41)**

Plaintiff asks that this Court take judicial notice of the "post-conviction case currently in

front of the Honorable Judge Melissa Moody involving a DUI that [he] plead guilty to under

unquestionable duress caused by the Defendants' brutal attack."  Mot. to Take Judicial Not., p. 1

(Docket No. 41).  That case has no bearing on the instant action and the claims raised herein.

Accordingly, Plaintiff's Motion to Take Judicial Notice (Docket No. 41) is denied.[11]

**C.      Plaintiff's Motion to Produce Video and Medical Records and Polygraph
         (Docket No. 47)**

On July 23, 2015, the undersigned denied Plaintiff's "Motion Seeking More Time for

Discovery" (Docket No. 33) as moot.  *See* 7/23/15 Order (Docket No. 44).  Still, the Court

indicated within its Order:

> The Court will permit Plaintiff to renew the motion if Plaintiff can demonstrate that
> he did not fully understand that he could pursue discovery, and if he was relying
> upon the need for some sort of express order from the Court to permit the same, and

---

[11]  Even if the Court granted Plaintiff's request to take judicial notice, the undersigned's
recommendations concerning Defendants' Motion for Summary Judgment would not change.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 26**

was not taking any affirmative steps toward conducting such discovery while awaiting a decision upon his "Motion Seeking More Time for Discovery." Any argument he might raise in support of such a claim must be supported by a declaration or affidavit affirming under penalty of perjury the facts which Plaintiff may contend would support his being permitted to renew the Motion.

*Id.* at p. 2. On August 10, 2015, Plaintiff submitted an affidavit "affirming [he] did not understand the deadlines or the procedure." Pl.'s Aff. (Docket No. 45). Therefore, to ensure an adequate opportunity to conduct discovery and develop the necessary record, the undersigned extended the discovery deadline to October 16, 2015, adding: "To be clear, discovery should be *completed* by this date." 8/18/15 Order, p. 1 (Docket No. 46).

On September 1, 2015, Plaintiff filed the Motion to Produce Video and Medical Records and Polygraph, requesting (1) the "surveillance" video of the night in question, (2) the medical records generated from the August 22, 2012 incident, and (3) a polygraph test. *See* Mot. to Produce, pp. 1-2 (Docket No. 47). In response, Defendants claim that, as of December 11, 2014, they have "produced 737 pages of records, including all of Mr. Meredith's medical records," as well as a list of individuals likely to have discoverable information." Resp. to Mot. to Produce, pp. 3-4 (Docket No. 49).

Though Defendants state that they "have produced all records concerning Mr. Meredith that exist," nowhere in their response to Plaintiff's Motion do they comment upon the requested "surveillance" video of the night in question. *See* id. at p. 4. It is therefore not clear whether such a video exists, whether such a video has ever been produced, and/or whether Defendants object to the production of any such video. To resolve this ambiguity, the Court requires that, within 14 days of this Report and Recommendation/Memorandum Decision and Order, Defendants submit a more focused response as to this specific request from Plaintiff. The balance of Plaintiff's Motion is denied – the Court is satisfied that Defendants have produced the

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 27**

requested medical records and Plaintiff is not entitled to require Defendants to submit to any polygraph examination.

## IV.  RECOMMENDATION/ORDER

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendants' Motion for Summary Judgment (Docket No. 35) be GRANTED, in part, and DENIED, in part, as follows:

1.       Plaintiff's excessive force claim against Deputy Arnold be dismissed.  In this respect, Defendants' Motion for Summary Judgment should be GRANTED; and

2.       Plaintiff's failure to protect/deliberate indifference claim against Deputies Roe and Culbertson not be dismissed.  In this respect, Defendants' Motion for Summary Judgment should be DENIED.

Pursuant to District of Idaho Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days. . ., unless the magistrate or district judge sets a different time period."  Additionally, the other party "may serve and file a response, not to exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."

Moreover, based on the foregoing, IT IS HEREBY ORDERED that:

1.       Plaintiff's Motion to Take Judicial Notice (Docket No. 41) is DENIED; and

2.       Plaintiff's Motion to Produce Video and Medical Records and Polygraph (Docket No. 47) is DENIED as to Plaintiff's request for medical records and a polygraph.  As to its additional request for a surveillance video, the Court reserves judgment at this time.  Within 14

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 28**

days of this Report and Recommendation/Memorandum Decision and Order, Defendants are to

submit a more focused response as to this specific request.



DATED: **February 16, 2016**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 29**